

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-10-00448-CV**

IN THE INTEREST OF J.P., T.J.,
AND D.F., CHILDREN

----------

FROM COUNTY COURT AT LAW NO. 1 OF WICHITA COUNTY

----------

## MEMORANDUM OPINION[1] ON REHEARING

----------

On December 15, 2011, this court issued a memorandum opinion affirming the termination of Mother's parental rights and reversing and remanding the termination of Father's parental rights. The Texas Department of Family and Protective Services filed a motion for rehearing, complaining of a nine-word phrase that could cause confusion to future litigants and arguing that the evidence was factually sufficient to support the jury's finding that termination of Father's parental rights is in J.P.'s best interest. We deny the Department's

---

[1]*See* Tex. R. App. P. 47.4.

motion for rehearing but withdraw our prior memorandum opinion and judgment dated December 15, 2011, and substitute the following in its place to delete the nine words complained of by the Department.

## I. INTRODUCTION

This is a termination of parental rights appeal. In three issues, Appellant Mother challenges the trial court's order terminating her parental rights to J.P., T.J., and D.F.; in five issues, Appellant Father challenges the trial court's order terminating his parental rights to J.P.[2] We will affirm as to Mother and reverse and remand as to Father.

## II. FACTUAL AND PROCEDURAL OVERVIEW[3]

Mother was thirty at the time of the termination trial and had given birth to six children—J.P., J.K., T.J., D.F., T.F., and G.M.-B.—but had never been married to any of the fathers of her six children. Of the six children, only G.M.-B. lived with Mother at the time of trial.

The Texas Department of Family and Protective Services[4] initially filed a petition in December 2005 to terminate Mother's parental rights to T.J. and D.F.

---

[2]The fathers of T.J. and D.F. did not appeal the termination of their parental rights.

[3]The record in this case is voluminous, containing sixteen volumes of reporter's records and sixteen volumes of clerk's records, plus a supplemental clerk's record. Based on our disposition of the issues raised, we set forth only an overview of the procedural and factual background here. Additional facts related to Father are set forth below in our analysis of Father's challenge to the best interest finding.

When the statutory dismissal date of June 2007 approached, the trial court entered a final order naming Mother as possessory conservator of T.J. and D.F.

The Department filed a suit concerning J.P. in September 2006. But in August 2008, the Department agreed that it was in the best interest of J.P. for Mother and Father to remain J.P.'s possessory conservators, and the Department was named permanent managing conservator of J.P. The Department abandoned its petition.

In July 2010, the Department filed another petition for termination of Mother's and Father's parental rights concerning J.P., T.J., and D.F. After a trial, a jury returned a verdict terminating Mother's parental rights to J.P., T.J., and D.F. and terminating Father's parental rights to J.P. The trial court signed a termination order based on the jury's verdict, and this appeal followed.[5]

### III. ISSUES PRESENTED

Mother raises three issues on appeal. She argues that the trial court abused its discretion by admitting testimony and evidence regarding incidents occurring prior to June 15, 2007, for T.J. and D.F., and prior to August 29, 2008, for J.P.; that there was legally and factually insufficient evidence to show that

[4]We refer to the Texas Department of Family and Protective Services interchangeably as "the Department" and "CPS."

[5]This is the third termination appeal addressing Mother's parental rights; we previously affirmed orders terminating Mother's parental rights to J.K. and to T.F. *See In re J.G.K.*, No. 02-10-00188-CV, 2011 WL 2518800, at *45 (Tex. App.—Fort Worth June 23, 2011, no pet.) (mem. op.); *In re T.T.F.*, 331 S.W.3d 461, 489 (Tex. App.—Fort Worth 2010, no pet.).

3

circumstances had changed materially and substantially as required to support termination under family code section 161.004; and that the trial court abused its discretion by denying her requested changes to the jury charge.

Father raises five issues on appeal. He argues that the evidence is legally and factually insufficient to support the jury's best interest finding, that the evidence is legally and factually insufficient to support termination under family code section 161.004, and that the trial court abused its discretion by admitting testimony and other evidence regarding incidents occurring prior to August 29, 2008, regarding Father and/or J.P.

## IV. BURDEN OF PROOF AND STANDARDS OF REVIEW

### A. Burden of Proof

A parent's rights to "the companionship, care, custody, and management" of her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. *See* Tex. Fam. Code Ann. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20–21; *In re R.R.*, 294 S.W.3d 213, 233 (Tex. App.—Fort Worth 2009, no pet.).

4

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must establish one ground listed under subsection (1) of the statute and must also prove that termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001 (West Supp. 2011); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re D.T.*, 34 S.W.3d 625, 629 (Tex. App.—Fort Worth 2000, pet. denied).

Termination decisions must be supported by clear and convincing evidence. Tex. Fam. Code Ann. § 161.001; *see also* § 161.206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because termination results in permanent, irrevocable changes for the parent and child. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *see In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and modification).

## B. Legal Sufficiency Standard of Review

In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were

5

proven. *In re J.P.B.,* 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.* We resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *Id.*

We cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* at 573, 574. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.* at 573.

### C. Factual Sufficiency Standard of Review

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the verdict with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated a provision of section 161.001(1) and that the termination of the parent-child relationship would be in the best interest of the child. Tex. Fam. Code Ann. § 161.001; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have

6

credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. If we reverse on factual sufficiency grounds, then we must detail in our opinion why we have concluded that a reasonable factfinder could not have credited disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266–67.

## V. TERMINATION WAS PROPER AS TO MOTHER BASED ON FINDINGS UNDER SECTION 161.001(1)

Mother's second issue challenges the sufficiency of the evidence to show under family code section 161.004 that circumstances had materially and substantially changed since the prior orders denying termination of Mother's parental rights to T.J., D.F., and J.P. Mother's second issue presupposes that, after an order denying termination has been entered, family code section 161.004 is the exclusive statutory vehicle available for any subsequent termination. We recently held that section 161.004 does not provide the exclusive grounds for terminating a parent's parental rights following entry of an order denying termination in a prior termination proceeding. *See In re K.G.*, 350 S.W.3d 338, 352 (Tex. App.—Fort Worth 2011, pet. filed) (overruling mother's issue claiming that section 161.004 presented exclusive grounds for termination of her parental rights—after denying first petition to terminate—was under section 161.004(b)).

7

Here, the Department pleaded grounds for terminating Mother's parental rights not only under section 161.004, but also under various subsections of family code section 161.001(1), including subsection (M). Concerning subsection (M), the Department pleaded that Mother "has had her parent-child relationship terminated with respect to another child based on a finding that the mother's conduct was in violation of § 161.001(1)(D) or (E), Texas Family Code, or substantially equivalent provisions of the law of another state." *See* Tex. Fam. Code Ann. § 161.001(1)(M) (West 2008). The court's charge authorized the jury to base a termination finding on this ground, and the final order of termination specifies that clear and convincing evidence exists supporting termination of Mother's parental rights based on this ground. Yet, Mother does not attack on appeal the section 161.001(1)(M) ground or any of the other non-section-161.004 grounds for termination pleaded, submitted to the jury, and specified as grounds for termination in the final termination order. When, as here, Mother does not challenge an independent ground that may, under the record presented, support the judgment that she seeks to reverse, this court may not address either the challenged grounds or the unchallenged grounds and has no choice but to overrule the challenges that Mother has chosen to assert. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (holding that father's failure to challenge sufficiency of evidence to support finding under one subsection of section 161.001(1) made it unnecessary—when best interest finding had been made—to address father's challenges to other grounds for termination); *Fletcher v. Dep't of Family &*

8

*Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (holding that because mother's appeal challenged only three of the six grounds for termination found by the trial court, and because any of the unchallenged findings—along with the best interest finding—would support the order of termination, it was unnecessary to address mother's issues challenging only three of the grounds). Because Mother did not challenge on appeal the independent ground under subsection (M) of section 161.001(1) that may, under the record presented,[6] support the final order of termination of Mother's parental rights to T.J., D.F., and J.P., we overrule Mother's second issue challenging the termination under section 161.004. *See, e.g., Fletcher*, 277 S.W.3d at 64.

Because the order of termination was proper on section 161.001(1)(M) grounds, any error in the trial court's admission of evidence related to the prior termination proceedings was harmless; we therefore overrule Mother's first issue. *See K.G.*, 2011 WL 3211210, at *11 (holding that error in admitting evidence from time period before denial of Department's first petition was harmless because termination was proper on section 161.001(1)(N) grounds). We need not address Mother's third issue, challenging the denial of her requested jury charge language concerning submission of section 161.004 grounds for

---

[6]The record establishes that Mother's parental rights to T.F. were terminated in September 2009 and that Mother's parental rights to J.K. were terminated in May 2010; both terminations were based on section 161.001(1)(D) or (E) endangerment findings. *See J.G.K.*, 2011 WL 2518800, at *45; *T.T.F.*, 331 S.W.3d at 489.

9

termination, in light of our holding that the termination order is supported by section 161.001(1)(M) grounds; we therefore overrule Mother's third issue.

## VI. EVIDENCE WAS NOT FACTUALLY SUFFICIENT TO SUPPORT JURY'S BEST INTEREST FINDING TERMINATING FATHER'S PARENTAL RIGHTS UNDER SECTION 161.001(2)

In his first and second issues, Father challenges the legal and factual sufficiency of the evidence to support the jury's finding that termination of his parental rights to J.P. was in J.P.'s best interest.

### A. Presumption and Law on Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West 2008).

Here, the jury was asked to consider the following nonexclusive factors in determining the best interest of the child:

(A)  the desires of the child;

(B)  the emotional and physical needs of the child now and in the future;

(C)  the emotional and physical danger to the child now and in the future;

(D)  the parental abilities of the individuals seeking custody;

(E)  the programs available to assist these individuals to promote the best interest of the child;

(F)  the plans for the child by these individuals or by the agency seeking custody;

10

(G)     the stability of the home or proposed placement;

(H)     the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)     any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.  *C.H.*, 89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.  *Id.*  On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

## B.  Overview of J.P.'s Situation

Due to J.P.'s unique emotional challenges and circumstances at the time of trial, we set forth some of those details here before analyzing the evidence related to the *Holley* factors.

J.P. was eleven at the time of the termination trial and had been in CPS's care about half of his eleven years.  Father described J.P. as "a real nice little boy" who is very active, loves to play, and enjoys meeting new people.  J.P. liked

11

to play football, basketball, baseball,[7] and video games. Johnson said that J.P. is a "really neat kid, but he does have some issues." J.P. has some learning issues, including dyslexia. J.P. also exhibited mental and emotional problems, which became worse while he was in foster care.

J.P. was admitted to psychiatric hospitals three times while in foster care. After he was hospitalized, J.P. was diagnosed with "major depression recurrent" and was placed on antidepressants.

J.P. had multiple "meltdowns"; it was hard for him to cope with the regular stresses of life. J.P. experienced meltdowns at school that resulted in numerous calls to his foster parents and to CPS. J.P. was almost expelled from school because of his behavior.

He also exhibited oppositional behaviors in which he would not wear his seat belt, would get out of a car, and would run down the road. During one visit while Father was in the restroom, J.P. took the elevator downstairs, ran out the door, and took off running through the parking lot, which is located on a very busy street. He did not run across the street, but that was CPS's fear. J.P. ran to Father and gave Father a hug when Father was able to get down to the parking lot.

---

[7]According to CPS Supervisor Linda Johnson, J.P. is one of the most talented athletes whom she has ever seen and was the most valuable player on his "midget" football team, having been recruited as a nine year old.

After J.P. became aggressive in foster care, he was admitted to Red River, where a level of care was determined. He then went to a residential treatment center (RTC).

At the time of the termination trial, J.P. had been in the RTC in Belton receiving special care for his mental health issues for three or four months, and he was making improvements but was not ready to be released. At the RTC, J.P. lived in a cottage with eight other boys in his age range and had house parents who stayed at the cottage in different shifts. J.P. was required to comply with the rules, to not be oppositional, to go along with the program, and to complete his chores, and when he met his goals, he was rewarded by being able to play video games.

J.P. attended school on the RTC's campus and had therapy with a therapist and psychiatrist. According to Johnson, J.P. was enjoying school more than previously; he was in a charter school on campus with ten students, a teacher, and an aide. The school implemented a dyslexia program to assist J.P. Johnson said that J.P. was proud of maintaining a high level of performance and was thriving at the RTC because he was "getting a lot of help that he really needed."

### C. Analysis of *Holley* Factors

### 1. Desires of the Child

Although J.P. did not testify at trial, the evidence established that Father and J.P. are well bonded, that the two have a normal father-son relationship, and that J.P. wanted to live with Father.

### 2. Emotional and Physical Needs and Dangers of J.P. Now and in the Future

As mentioned above, J.P. had been diagnosed with dyslexia and "major depression recurrent." Both of these conditions require treatment, which he was receiving at the RTC.

The record also established that the one constant in J.P.'s eleven years of life, half of which were spent in CPS care, was Father. Father consistently supported J.P. financially; Father paid child support when J.P. went to foster care and had a credit for overpaying child support at the time of the trial. Father consistently visited J.P., rarely missing a visit.

J.P. calls Father "Daddy," runs to him, and hugs him at the visits. On the rare occasions when Father was unable to visit, J.P. said that he was upset and disappointed. During J.P.'s visits with Mother (which preceded his visits with Father), J.P. anticipated Father's visit and asked whether Father was there and whether he was coming. Prior to admission to the RTC, J.P. had expressed suicidal thoughts after one of J.P.'s very close friends was killed in a car-train collision; because J.P. was closely bonded to Father and because of J.P.'s

14

difficulties dealing with the death of his friend, a reasonable concern exists as to how J.P. would handle having Father removed from his life.

### 3. Father's Parental Abilities

Father testified that he was forty-five years old and has three children, but only his son J.P. is involved in this case. Father said that J.P. was eleven at the time of trial and that his birthday is June 4.

Father participated in special education classes and graduated from high school, but he did not know how to read and write very well. Despite his reading problems, Father had been working for a little over thirty years. At the time of the trial, Father was working at Taylor Foundry and had been working there for almost fourteen years. Father does not have a car, so he walks to his job and to the visits with J.P.

Father loves J.P., has always been involved in his life, and has never physically abused J.P. Father supported J.P. when he lived with J.P., has paid child support while J.P. has been in foster care, and had a credit for overpaying child support at the time of the trial. Father regularly visits J.P., and CPS described the visits as "very good."

CPS claimed that occasionally during visits with J.P., Father would not say the right thing. For instance, Johnson said that Father would sometimes show up to visits being very negative and berate J.P. for not having his hair cut; Father would tell J.P. that he was not coming back to visit if J.P. did not have his hair cut by the next visit. Father admitted that he had told J.P. that he was getting fat; he

said, "That's the way black people is, man. We don't live and think the way y'all do."

Moreover, Father did not appear to understand J.P.'s mental and emotional vulnerabilities. Father did not agree that J.P. had problems. Father said that "[J.P.] act[s] like any other kid would if you take [him] away from [his] parents" and force him to live with "strange kids." Father said that the way J.P. laughs, talks, does his homework, and goes to school is all normal. When Father was asked whether it was normal that J.P. threatened suicide, he said,

> [J.P.] never threatened -- I don't understand why y'all can't see it. I have seen a lot of little kids get mad. The kids get mad and say, Oh, I'm gonna kill myself. Kids does that stuff. Why y'all can't see that? I've seen white kids do it, Mexican kids do it. Kids do and say stuff like that when they angry. But y'all look at it like he gonna hurt somebody. He's not gonna hurt anybody.

When Father was asked about times when J.P. was not mad when he threatened suicide, Father said that J.P. does "stuff like that" because he is not with his family but is with strangers.

Father did not understand why J.P. had been put on medication because he gets angry. Father said that nothing was wrong with J.P.'s mind and that CPS was destroying J.P.'s mind.[8] Father told J.P. that he did not need to take his medicine "because some white doctor gave it to him" and that he was only given

---

[8]Father said that J.P. is the same person in foster care that he was before he was removed except that he probably gets upset more often because he is not with his family. Father believes that it is a nightmare for any child to be away from his family.

16

the medicine because he is black. Father said that J.P. has never run away from the visitation center, that J.P. has run *to him* after a visitation, and that J.P. should not be given medication because of running to him. When asked whether Father thought J.P. needed medication if he is bipolar, he said, "If that's what y'all think. What I think, it don't matter."

When Father was asked how he would deal with J.P.'s anger problem, Father said that he would talk to J.P. and hit J.P.'s hand. When Father was asked how he would handle J.P.'s threatening to kill himself after a friend died, Father said that he would handle the situation by telling J.P. that everyone is going to die, that there is no need to kill himself, and that God does not want him to do that.

Father admitted that he was not currently able to provide stable housing for J.P. When shown pictures of a house that J.P. had lived in where nails were sticking out of boards, Father thought that it was normal and saw no danger to J.P.

Father also believed that it was acceptable for his son to be around people who hit women. Father, however, said that it was not okay for his son to be around people who did drugs and that he was not on drugs when he visited J.P. Father told Johnson that he used cocaine, that he had raised all of his children while occasionally using cocaine, and that he did not have a problem with it; he thought that people could raise their children and use cocaine.

### 4. Programs Available to Assist J.P.

At the time of trial, J.P. was in a RTC receiving specialized care[9] for his mental and emotional issues and was thriving. Additionally, the charter school that J.P. was attending through the RTC had implemented a dyslexia program to assist him. Johnson opined that after J.P. is released from the RTC, he will be placed in a therapeutic foster home where his special needs can continue to be addressed.

### 5. Father's Plans and CPS's Plans for J.P.

CPS caseworker Tammy Durham had several conversations with Father about J.P.'s coming to live with him, but Father said that he could not provide a safe and appropriate home for J.P. Father testified that he had told Durham "about a few months ago" that the way his life was going, he did not want to bring J.P. to his level because if Father brought J.P. to his level, then he would miss out on sports and school because Father lacked transportation. Father said that J.P. deserves "more." But Father said that keeping his relationship with J.P. is "everything" to him.

Johnson believed that it was in J.P.'s best interest that Father's parental rights be terminated so that J.P. could be placed for adoption. In making the

---

[9]Johnson explained the levels of care in the foster system: basic is the standard care that a parent would provide; a level above that is moderate, in which a child has therapeutic needs such as counseling, extra help at school, or behavior issues; and the highest level is specialized, in which a child has significant mental health needs.

recommendation regarding terminating Father's parental rights to J.P., Johnson took into account Father's parental abilities, the programs available to J.P. from the Department, and the stability that the Department can provide J.P. At the time of trial, J.P. was not an adoptive placement, but Johnson believed that J.P. could be adopted in the future.

### 6. Stability of Proposed Placement

At the time of the termination trial, eleven-year-old J.P. was receiving specialized care in a RTC and was expected to be there for six to twelve months. From the RTC, CPS expected J.P. to be moved to a therapeutic foster home and supposed that then twelve-to-almost-thirteen-year-old J.P. could be adopted. Because J.P. was not an adoptive placement at the time of the trial, CPS did not present any evidence as to the stability of the proposed placement.

### 7. Acts or Omissions of Father

Father admitted that even knowing that he was going to trial where he could lose his parental rights, he had still used marijuana two weeks prior to trial and had used cocaine and crack about a month prior to trial. Father said that he could not provide a safe and appropriate home for J.P. at the time of trial, but wanted to maintain his relationship with J.P. And Father has not played an active role in helping J.P. overcome his emotional issues.

### 8. Excuses for Father's Acts or Omissions

Father told his counselor that the only reason he was in this situation was because "some white woman wants my kid" and that he was tired of "being

19

messed with." Father testified that the reason J.P. was placed in CPS's care was that Mother did not "have her stuff together" and that the reason J.P. is still there is because Father cannot get him out because Father does not have "his stuff together." Father admitted that he could not take J.P. home with him because "I ain't got myself together." Father could not put a date on when he would have his act together or how long J.P. would have to wait. Father said that it may look like he has not been trying to get J.P. back, but he was "gettin' a little bit better." And Father repeatedly testified that maintaining his relationship with J.P. was "everything" to him.

## D. Legally Sufficient Evidence of Best Interest

We hold that, viewing the evidence in the light most favorable to the judgment and disregarding evidence contrary to the trial court's best interest finding unless a reasonable factfinder could not, the following evidence (among other facts) could have reasonably persuaded the jury that termination of Father's parental rights is in J.P.'s best interest: (1) Father had been abusing drugs for years and had used crack, cocaine, and marijuana during the month prior to the termination trial; (2) Father was not in a position to provide stable housing for J.P. at the time of trial or in the immediate future; (3) Father had failed to acknowledge J.P.'s mental health issues and had on one occasion instructed J.P. that it was okay to not take his medication; and (4) Father did not see a problem if J.P. was exposed to domestic violence or unsafe living conditions. *See J.P.B.,* 180 S.W.3d at 573; *In re N.A.,* No 02-10-00022-CV, 2010

20

WL 3834640, at *8 (Tex. App.—Fort Worth Sept. 30, 2010, no pet.) (mem. op.). Because we hold that the evidence is legally sufficient to support the best interest finding, we overrule Father's first issue.

### E. Factually Insufficient Evidence of Best Interest

Viewing all of the evidence, however, no reasonable factfinder could form a firm belief or conviction that the termination of Father's parental rights to J.P. was in J.P.'s best interest. The disputed evidence on whether termination of Father's parental rights was in J.P.'s best interest is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *See J.F.C.*, 96 S.W.3d at 266. The disputed evidence that a reasonable factfinder could not have credited in support of its finding that termination of Father's parental rights to J.P. was in J.P.'s best interest included evidence that J.P. loved and wanted a relationship with Father, that Father loved and wanted a relationship with J.P., that Father and J.P. were well-bonded, that Father was the one constant that J.P. had in his life, that termination of Father's rights while J.P. was in a fragile emotional state from the death of a close friend could be detrimental to J.P., that Father had regularly visited J.P., that Father had provided for J.P. financially throughout his life, that J.P. was older and suffered from mental health issues and was therefore less likely to be adopted, that no foster family had indicated a desire to adopt J.P., that the Department had no adoptive placement ready at the time of the termination trial, that the grounds for terminating Father's rights did not involve allegations of physical abuse or sexual

21

abuse of J.P., that there were no allegations that Father had a lengthy criminal history, and that Father had worked for thirty years and had held the same job for the last fourteen years. The evidence that the jury could have credited in support of its finding that termination of Father's parental rights to J.P. was in J.P.'s best interest included evidence that Father did not have a stable home, had an extremely low standard of what housing conditions were okay for J.P., thought some domestic violence was normal, continued to use drugs when he was not around J.P., had on occasion told J.P. not to take his medication, and had on occasion said inappropriate things like threatening not to visit J.P. if he did not cut his hair. Giving due consideration to the evidence that the jury could have credited in support of its finding that termination of Father's parental rights to J.P. was in J.P.'s best interest nonetheless, the evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of Father's parental rights to J.P. was in J.P.'s best interest. Viewing the evidence under the relevant standard of review, the evidence is factually insufficient to defeat the strong presumption that maintaining J.P.'s relationship with Father is in his best interest. *See R.R.*, 209 S.W.3d at 116; *H.R.M.*, 209 S.W.3d at 108; *N.A.*, 2010 WL 3834640, at \*11. We therefore sustain Father's second issue.

Because our holding on Father's second issue is dispositive, we decline to address his other issues. *See In re C.T.E.*, 95 S.W.3d 462, 469 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (declining to address father's other issues,

including whether trial court improperly admitted evidence of father's conduct prior to date trial court terminated mother's parental rights—but not father's—and appointed TDFPS as managing conservator and whether evidence was legally and factually insufficient to support endangerment finding, after holding evidence factually insufficient to support best interest finding); *see also* Tex. R. App. P. 47.1 (stating appellate court need only address every issue necessary to final disposition of appeal).

## VII. CONCLUSION

Having overruled each of the issues presented by Mother, we affirm the trial court's judgment terminating Mother's parental rights to J.P., T.J., and D.F. Having sustained Father's second issue, we reverse the trial court's judgment terminating Father's parental rights to J.P. and remand his case for a new trial.

SUE WALKER
JUSTICE

PANEL:  GARDNER, WALKER, and MCCOY, JJ.

DELIVERED: February 23, 2012